UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BALESTRIERE PLLC,<br><br>      Plaintiff,<br><br> - against -<br><br>JAMAL E. WATSON,<br><br>      Defendant. | 08 CV 0578<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

  Plaintiff Balestriere PLLC ("Balestriere PLLC" or "the Firm"), for its Complaint against Defendant Jamal E. Watson ("Watson"), respectfully alleges as follows upon information and belief, except as to allegations concerning Plaintiff, which are made upon personal knowledge, and except as otherwise indicated herein:

### PRELIMINARY STATEMENT

  1. The Firm is forced to sue Watson, its former client, for $120,684.74, plus interest and costs, in legal fees unpaid for more than a year.

  2. In November 2005, Defendant Watson, a Georgetown University alumnus, Ph.D. candidate, and established journalist, was charged with grand larceny for stealing money from his employer, the *Amsterdam News*. Watson then retained Balestriere PLLC to defend him in his criminal case, agreeing in a detailed, written engagement letter to pay the Firm for legal fees incurred in connection with his defense.

  3. The Firm spent an enormous amount of time to defend Watson, much more time and effort than would be devoted to the typical state criminal case due to

Watson's consistent protestations of innocence and the complexity of legal and factual issues involved in the case. Moreover, the Firm did exemplary work, as evidenced by Watson's own admissions, and the Firm was prepared to fight for Watson's innocence to the fullest extent possible. However, on the eve of trial, Watson decided to plead guilty because he did not want to risk being incarcerated.

4.  Despite agreeing to pay the Firm for all of the legal work it provided, and despite reiterating his commitment to pay on numerous occasions, Watson has since his sentence nearly a year ago refused to pay well over $100,000 in outstanding legal fees.

5.  Moreover, Watson essentially disappeared altogether after a mysterious, supposedly crippling car accident that allegedly occurred in February 2007. However, an article under his byline was published almost immediately *after* the alleged incident, and several articles have appeared during a time Watson has a supposedly been laid up in the hospital.

6.  The Firm has made many attempts to contact Watson to reach an amicable solution, but every one of those attempts has failed. The Firm is forced to bring this suit to recover monies owed in connection with the Firm's defense of Watson.

## JURISDICTION AND VENUE

7.  This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendant are citizens of different states and because there is more than $75,000.00 in controversy. Plaintiff Balestriere PLLC is a New York professional limited-liability corporation, and Defendant is a citizen of the State of New Jersey.

2

8. This Court may properly exercise personal jurisdiction over the parties because Balestriere PLLC is a New York domiciliary and because Watson has purposefully availed itself of the privileges and protections of the laws of the State of New York.

9. Venue is properly laid in the Southern District of New York under 28 U.S.C. §1391(b) because the claims arose in this District.

## JURY DEMAND

6. Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7. Balestriere PLLC is a law Firm located at 225 Broadway, Suite 2700, New York, New York, in this District, that provides trials and investigative services, including representation in criminal defense matters.

8. Watson's chief counsel at the Firm was John G. Balestriere ("Balestriere"), a New York licensed attorney who previously worked as an Assistant District Attorney in New York County, an Assistant Attorney General in Eliot Spitzer's State Attorney General Office, and a litigator in a private law firm.

9. Jamal E. Watson ("Watson"), whose last known residence was 2151 Route 38 East, #708, Cherry Hill, New Jersey, established journalist and professor who once served as the Executive Editor for the *Amsterdam News*, a leading African-American weekly newspaper. Watson has also worked for *The New York Sun*, and *The Boston Globe* and has been a professor at the State University of New York. Watson received his

3

Bachelor of Arts from Georgetown University, has earned a Master's Degree, and was a Ph.D. candidate.

10. Watson engaged the Firm to represent him in a criminal case and was a client of the Firm for fourteen months, from December 9, 2005, to January 29, 2007.

## STATEMENT OF FACTS

### Initiation of the Relationship between Balestriere PLLC and Watson

11. On November 18, 2005, Watson was arrested and charged with grand larceny for stealing money from the *Amsterdam News*, Watson's employer and the newspaper for which Watson was the Executive Editor.

12. Needing an attorney to represent him in his criminal defense, Watson subsequently contacted Balestriere to schedule a meeting. Watson and Balestriere met on December 7, 2005, and on that same date, Watson retained the Firm to represent him in *People of the State of New York v. Jamal Watson* (Ind. No. 0950/2006).

13. During this initial meeting, Balestriere fully explained to Watson the terms of the engagement for the Firm to represent Watson in this matter, including the billing rates of all staff who might work on the matter, that expenses are billed to the client, as well as the client's rights and obligations under the engagement letter agreement ("Agreement"). On December 9, 2005, Watson signed the Agreement, thus formally retaining the Firm. (*See* Agreement, attached as Exhibit A.)

14. The Agreement set forth in detail the Firm's billing policies, which Watson "understood and agreed to." (*See id.*)

4

15. In addition to Watson's promise to pay legal fees under the Agreement, Watson made numerous additional promises—oral and written—to pay whatever legal expenses accrued in connection with the Firm's representation of Watson.

16. Based on Watson's signing the Agreement and his numerous additional promises to pay for legal services rendered on his behalf, the Firm agreed to represent Watson in his criminal matter. In representing Watson, Balestriere devoted more hours to Watson's case than any others of the dozens the Firm handled in 2006.

Legal Representation of Watson by Balestriere PLLC

17. As soon as Watson retained the Firm to represent him in his criminal defense, the Firm immediately went to work on Watson's case. Throughout the course of the representation, the Firm performed exemplary work and provided Watson with nothing but the best representation in his legal matter.

18. Watson always claimed that he was innocent, so Balestriere endeavored to do everything in his power to secure a favorable outcome for Watson. Moreover, Balestriere's investigation of the *Amsterdam News* showed that individuals at the newspaper had serious credibility problems.

19. In one case, a key witness for the prosecution had even pled guilty years earlier to stealing money from the *Amsterdam News*. Thus, not only did Watson consistently claim innocence, but the prosecution's case had serious problems that warranted pushing Watson's case to trial.

20. Accordingly, this representation involved the expenditure of a huge amount of time, effort, and resources by the Firm, considerably more than usually devoted in similar cases.

21. The Firm drafted numerous filings in connection Watson's case. Moreover, the Firm performed extensive legal and factual research, writing numerous memoranda and briefs in connection with Watson's defense. This work included representation of Watson when he testified before the grand jury, a hard-fought motion to dismiss the indictment, interviews of several difficult-to-reach witnesses, conducting a pre-trial conditional exam, dozens of hours devoted to several motions *in limine*, a pre-trial suppression hearing, and dozens upon dozens of hours devoted to trial preparation.

22. In total, the Firm spent more than 346 hours defending Watson.

23. Watson consistently told Balestriere that he was very pleased with the job the Firm was doing on his behalf. For example, in an email from Watson to Balestriere on May 17, 2006, Watson commented that a Reply Brief in Support of Watson's Motion to Dismiss the Indictment drafted by Balestriere was "damn good" and that "it was well done and covered all of the important issues. . . ." (*See* May 17, 2006, Email, attached as Exhibit B.) Watson even wrote this in light of the uncertainty surrounding whether the motion would ultimately succeed.

24. As the parties were about to pick a jury, despite Watson's claim of innocence and the enormous amount of time and effort devoted to his defense, Watson

decided that he did not want to risk being incarcerated and pled guilty in exchange for receiving a promises of probation with no jail time.

25. After sentencing, on January 31, 2007, because Watson believed he no longer needed the Firm's services; and because he did not want to incur further legal fees, Watson told Balestriere that he wished the Firm to stop working on his case, thereby terminating the engagement between the Firm and Watson.

The Firm's Efforts to Get Watson to Pay

26. In engaging the Firm and by signing the Agreement on December 9, 2005, Watson expressly consented to being charged for legal work performed by the Firm on Watson's behalf. Specifically, Watson expressly agreed to pay an initial retainer fee to the Firm of $10,000.00 and additional retainer deposits as became necessary. Throughout the duration of the parties' attorney-client relationship, Watson continually reiterated his commitment as well as his ability to pay the Firm for the legal services rendered on his behalf.

27. At times Watson neglected to pay the Firm in a timely manner. Nonetheless, Watson continued to assert his willingness and readiness to compensate the Firm for the wonderful work that it had done, as is illustrated by the following:

- Throughout December 2005 and January 2006, Watson had difficulty providing the Firm with the initial $10,000 retainer, but Watson assured Balestriere numerous times that Watson was working to handle the matter as quickly as possible. (*See* December 2005 and January 2006 Emails, attached as Exhibit C.)

- On January 30, 2006, in response to an email from Balestriere indicating that a check for $2,000 had failed to clear, Watson explained that he would bring a new check for $2,000 to their next meeting and also that any remaining obligations would soon thereafter be satisfied. (*See* January 30, 2006, Email, attached as Exhibit D.)

- On March 15, 2006, following tardiness in paying outstanding balances from invoices from both January 2006 and February 2006, Watson paid $3,000 toward his balance and orally assured Balestriere that he would satisfy his payment obligations. (*See* March 15, 2006, Email, attached as Exhibit E.)

- On or about March 22, 2006, Watson paid an additional $2,000, thereby demonstrating his continued willingness to pay for the legal services rendered by the Firm.

- On April 10, 2006, in an email from Watson to Balestriere, Watson stated that he anticipated paying the balance of all fees owed to the Firm by April 26, 2006, and Watson reiterated the same in another email on April 18. (*See* April 10 and 18, 2006, Emails, attached as Exhibit F.)

- On June 21, 2006, in response to an email from Balestriere, Watson stated that he would sent a check to the Firm for past invoices due and reiterated that he wanted to continue retaining the Firm for his case. (*See* June 21, 2006, Email, attached as Exhibit G.)

8

- On July 18, 2006, after receiving another email from Balestriere concerning late payments, Watson said there was still "the commitment to pay" and that he "will make sure that [the Firm is] paid every dime." (*See* July 18, 2006, Email, attached as Exhibit H.)

- On August 1, 2006, Watson wrote an email to Balestriere requesting the amount owed so he could devise a plan to pay his legal fees. (*See* August 1, 2006, Email, attached as Exhibit I.)

28. After Watson decided to plead guilty in December 2006, the Firm sent Watson a detailed list of all invoices to address the issue of Watson's non-payment. Watson acknowledged that he received all of the relevant invoice-related documents on January 8, 2007.

29. On January 12, 2007, Watson emailed Balestriere and, for the first time, expressed dissatisfaction with the amount of legal fees owed, but nevertheless claimed that he was committed to paying his legal fees.

30. Watson and Balestriere agreed to meet on January 29, 2007, where they planned to discuss payment issues as well as the work that still needed to be done in connection with Watson's case.

31. At this January 29, 2007, meeting, Watson again orally reaffirmed to Balestriere his commitment to pay the Firm.

32. On January 31, 2007, Watson contacted Balestriere by email, requesting that the Firm discontinue working on Watson's case, explaining that Watson did not

want to incur any additional expenses in connection with the Firm's representation of Watson. (*See* January 31, 2007, Email, attached as Exhibit J.)

33. In response, the Firm agreed to quit working on Watson's case, and the parties agreed to meet on March 8, 2007, in order to discuss final payment provisions.

<u>Watson's Alleged Accident</u>

34. Shortly before their scheduled meeting, Watson was allegedly involved in a car accident in Los Angeles, California on February 23, 2007. This information was conveyed to Balestriere in an email sent from "Samuel Rhett," an online blogger who supposedly writes about journalism, on February 26, 2007. (*See* January 31, 2007, Email, attached as Exhibit K.)

35. Except for Rhett's fortuitous February 26 email, which solicited information only about the alleged accident, no one associated with the Firm had ever received any communication from Rhett regarding the case or anything else.

36. Furthermore, attempts to locate Rhett or Rhett's blog online have been unsuccessful. (*See* Google.com Search Results, attached as Exhibit L.)

37. On March 19, 2007, after Watson missed the scheduled March 8 meeting, having received no emails or any other communication from or about Watson, Balestriere received an email sent through Watson's email account from an unknown "Brian" with an update on Watson's status. (*See* March 19, 2007, Email, attached as Exhibit M.)

38. According to the email from "Brian," Watson was recovering steadily, but would be not be fully recovered for a period of at least six to nine months, i.e., for the remainder of 2007.

39. Mysteriously, however, on March 6, 2006—barely two weeks *after* the alleged life-threatening accident and two weeks *before* the email that indicated that Watson would not be "up and about" for at least six to nine months—an article written by Watson appeared on DiverseEducation.com, a website dedicated to discussing issues in higher education. (*See* March 6, 2007, Article, attached as Exhibit N.)

40. This March 6 article included a personal account of the 150th anniversary of the U.S. Supreme Court's March 6, 1856, decision in *Dred Scott v. Sandford*, commemorated in St. Louis, Missouri—thousands of miles from Los Angeles, California, where Watson was "steadily recovering," according to "Brian."

41. The article even included excerpts from several in-person interviews with Scott's descendants, members of the community, and other individuals who decided to make the trek to St. Louis, interviews that could not have been conducted from afar.

42. Watson could not have been in any accident as "Samuel Rhett" and "Brian" claimed.

43. Watson's name has since further appeared in the byline of numerous articles, including several posted on DiverseEducation.com. (*See, e.g.*, Articles by Watson, attached as Exhibit O.)

44. Ever since Watson indicated that he no longer wished to retain the Firm to represent him, and ever since Watson mysteriously disappeared without contact due to

11

the supposed accident, the Firm has taken numerous steps to recover legal fees owed by Watson, but none of these attempts has been successful.

45.     As of the date this Complaint was filed, nearly eleven months has passed since the alleged accident, but neither Watson—nor "Brian" or anyone else—has contacted the Firm to address outstanding payment issues.

46.     Watson has an outstanding balance with the Firm for services rendered in the amount of $120,684.74.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

47.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 46 above as if fully set forth herein.

48.     A valid contract existed between the Firm and Watson.

49.     Under this Agreement, the Firm promised to provide legal services to Watson in exchange for Watson's promise to pay the Firm for services rendered on his behalf.

50.     The Firm performed its obligations under the Agreement by performing exemplary work on Watson's behalf.

51.     At the end of every month from December 2005 through to and including January 2007, the Firm sent to Watson invoices detailing legal fees he owed to the Firm for legal services provided by the Firm in connection with his criminal matter.

52.     Watson has never objected to any of the items listed or the total amount charged in any of the invoices.

53. Watson repeatedly reiterated his commitment to satisfy completely his payment obligations to the Firm.

54. Although Watson has made partial payments on balances due throughout the course of the relationship between Watson and the Firm, Watson has to this day failed to extinguish his obligations by fully satisfying the debt owed to the Firm.

55. The Firm has lost the value of all time and effort it expended to provide Watson with legal services from December 2005 to January 2007.

56. As a result of the foregoing, defendant is liable for an account stated by the Firm in an amount of damages to be determined at trial but not less than $120,684.74, plus interest and costs.

## SECOND CAUSE OF ACTION

### (Quantum Meruit)

57. Plaintiff repeats and realleges the allegations in paragraphs 1 through 53 above as if fully set forth herein.

58. From December 2005 to January 2007, the Firm fully and faithfully performed legal services for Watson based on Watson's numerous representations that he would pay for such services.

59. When the Firm performed those legal services for Watson, the Firm reasonably expected to be compensated by Watson for those services.

60. From December 2005 to January 2007, Watson encouraged the Firm to provide him with legal services, participated in the Firm's provision of such services, and accepted the benefits of the legal services the Firm provided to him.

61. The legal services the Firm provided to defendant from December 2005 to January 2007 were rendered under circumstances in which Watson knew that the Firm expected to be compensated for those services.

62. Accordingly, the Firm requests that Watson provide the Firm with the reasonable value of the legal services it provided to Watson from December 2005 to January 2007 in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

#### (Promissory Estoppel)

63. Plaintiff repeats and realleges the allegations in paragraphs 1 through 59 above as if fully set forth herein.

64. From December 2005 to January 2007, Watson made numerous clear and unambiguous promises to pay for legal services from the Firm, on which the Firm reasonably and foreseeably relied when it began performing legal services for Watson.

65. From December 2005 to January 2007 the Firm fully and faithfully performed legal services for Watson based on Watson's promise that he would pay for such services.

66. Notwithstanding Watson's clear and unambiguous promise to pay for legal services provided by the Firm, Watson has never paid the Firm for any of the legal services it provided to him in from December 2005 to January 2007.

67. As a result of its reliance on Watson's promise to pay, the Firm has lost the value of all time and effort it expended in providing legal services to Watson.

68. Accordingly, Watson is liable to the Firm in an amount of damages to be determined at trial but not less than $120,684.74, plus interest and costs.

WHEREFORE, by reason of the foregoing, Plaintiff Balestriere PLLC demands judgment against Defendant Jamal E. Watson as follows:

A. $120,684.74 for the legal services Plaintiff provided to Defendant from December 2005 to January 2007;

B. Applicable interest on the foregoing amount;

C. Attorneys' fees and costs of suit; and

D. Such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          January 23, 2007

By: _____
William S. Holleman*
Craig Stuart Lanza (CL-2452)
**BALESTRIERE PLLC**
225 Broadway, Suite 2700
New York, NY 10007
Tel:   (212) 374-5421
Fax:   (212) 208-2613
Email: wholleman@balestriere.net
*Attorneys for Plaintiff*

---

* Admission pending to the New York State Bar.